In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00066-CV


______________________________




TONY PYLES, Appellant



V.



LOREN B. YOUNG AND LOUISE YOUNG, Appellees




 


On Appeal from the County Court at Law


Hunt County, Texas


Trial Court No. CC0600542




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 Loren B. Young and Louise Young petitioned the Hunt County Justice of the Peace Court,
4th Place, for a forcible entry and detainer to remove Tony Pyles and Teresa Overstreet from a
residence. The 196th Judicial District Court had determined in an earlier judgment that the residence
belonged to the Youngs. Pyles claimed the Youngs had failed to provide sufficient notice. Both the
justice court and, on appeal, the Hunt County Court at Law found in the Youngs' favor. Pyles
appeals the judgment and raises three issues on appeal. According to Pyles, the trial court erred in
rendering judgment for the Youngs because there was insufficient notice under the Texas Property
Code; the Youngs obtained the district court judgment by committing fraud; and the trial court
should have granted a new trial. We affirm the judgment of the trial court because 1) Pyles failed
to preserve error concerning any lack of notice subsequent to the first suit and 2) res judicata bars
relitigation of the sufficiency of the notice in the first suit. We decline the request of both parties
for sanctions.

Facts

 On February 26, 1998, Pyles and Overstreet entered into a contract for deed with the Youngs
for the purchase and sale of residential real property located at 8822 P.R. 2289. (1) The parties dispute
the terms of this contract. (2) During 2003 and 2004, the Youngs sent several notices of default and
foreclosure to Pyles and Overstreet. The record contains three notices mailed during this period. (3) 
On or about December 23, 2003, a notice of default letter was sent to Pyles and Overstreet at 8822
P.R. 2284 and returned marked "Undeliverable As Addressed - No Box." The certified mail return
receipt was returned unsigned. On or about March 8, 2004, a failure to cure default letter was sent
to Pyles and Overstreet at 8822 P.R. 2284. The attached certified mail return receipt was not signed
and, although not legible in the record, the letter appears to have been returned undelivered. Pyles
asserts the letter was returned marked "Insufficient Address." On or about April 22, 2004, a notice
of cancellation of the contract for deed was sent to Pyles and Overstreet at 8822 P.R. 2284. The
letter states a copy of the foreclosure deed and affidavit of foreclosure sale April 6, 2004, were
included. The record does not contain any envelopes or certified mail return receipts for this letter. 

 On or about May 18, 2005, the Youngs filed a complaint for forcible detainer against Pyles
in district court (the first suit). The Youngs' petition was later amended to bring a trespass to try title
suit. On April 24, 2006, the district court signed an order finding the Youngs to be owners of the
property at "8822 PR 2289." The judgment provides "[t]he Defendant, although duly notified of the
trial date, failed to appear." According to Pyles, he was "ill and unable to attend trial or pursue his
remedies in that action." Pyles did not appeal the post-answer default judgment of the district court. 

 On August 21, 2006, the Youngs filed a forcible detainer action in justice court (the second
suit). The justice court rendered judgment (4) for the Youngs, and Pyles (who had defended himself
pro se), appealed the justice court's judgment to the county court at law. In the county court at law,
Pyles, now represented by counsel, filed a "Counterpetition" alleging the Youngs committed fraud
in the first suit. The Youngs responded that Pyles' claims were barred by res judicata. Following
a trial de novo, the county court at law rendered judgment (5) that the Youngs were awarded possession
of the following premises:

 ALL THAT CERTAIN lot, tract, or parcel of land situated in Hunt County, Texas,
being described as Lot 11 and Lot 12 of the 3rd Installment of the QUINLAN
NORTH subdivision, a subdivision of Hunt County, Texas, as shown of record at
Vol. 400, pg. 587, Plat Records Hunt County, Texas; said parcel containing 6.3311
acres of land more or less; together with all improvements located thereon,
specifically including the white 12x50 ft. mobile home; more commonly referred to
as 8822 PR 2289.


On or about February 15, 2007, the 354th Judicial District Court sitting for the Hunt County Court
at Law signed a "Reformed Final Judgment," which included the same property description.

Pyles Failed to Preserve Error Concerning Lack of Notice After the First Suit

 Pyles argues the Youngs failed to give him sufficient written notice under Sections 24.002
and 24.005 of the Texas Property Code. Under the Texas Property Code, a landlord must make a
statutorily sufficient written demand for possession. See Tex. Prop. Code Ann. §§ 24.002, 24.005
(Vernon 2000); Kennedy v. Andover Place Apartments, 203 S.W.3d 495, 496 (Tex. App.--Houston
[14th Dist.] 2006, no pet.); see also AMC Mortg. Servs. v. Shields, No. 05-06-01194-CV, 2007 Tex.
App. LEXIS 3574 (Tex. App.--Dallas May 9, 2007, no pet.) (mem. op.). Although most of Pyles'
argument focuses on the notices given before the first suit, the argument could be interpreted as
claiming the Youngs were required to give another notice to vacate before filing the second suit. 

 By holding over after an adverse judgment had been rendered against him, Pyles became a
permissive tenant, or a tenant at sufferance. Tex-Wis Co. v. Johnson, 534 S.W.2d 895, 899 (Tex.
1976); Witcher v. Bennett, 120 S.W.3d 922, 924 (Tex. App.--Texarkana 2003, pet. denied). To the
extent Pyles' argument claims the Youngs provided insufficient notice to file the second suit, i.e.,
this forcible detainer suit, Pyles has failed to preserve error. Pyles has failed to direct this Court to
where in the record this issue was presented to the trial court. In order to preserve a complaint for
appellate review, a party must present to the trial court a timely request, objection, or motion "with
sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were
apparent from the context . . . ." Tex. R. App. P. 33.1(a)(1)(A). Pyles has failed to direct this Court
to where in the record he argued he was entitled to additional notice before the filing of the second
suit. In Pyles' "Counterpetition," Sections 24.005 and 24.002 are not cited, and Pyles merely alleges
the notices in the prior suit were insufficient. Because there is no reporter's record of the trial de
novo, there is no record of what arguments were made to the trial court. (6) This argument was not
raised in any of the post-trial hearings for which we do have a reporter's record. Even if Pyles was
entitled to additional notice before the filing of the second suit, the error is not preserved for our
review. See Tex. R. App. P. 33.1.

Res Judicata Bars Pyles From Relitigating the Notice Issues Which Should Have Been Raised
in the First Suit


 To the extent Pyles argues the Youngs provided insufficient notice before the first suit, Pyles'
claims are barred by res judicata. Throughout his brief, Pyles argues the notices provided by the
Youngs in 2003 and 2004 are inadequate because they were mailed to an incorrect address. Pyles
argues the foreclosure notices were insufficient under the Texas Property Code, citing Sections
24.002, 24.005, and 51.002. See Tex. Prop. Code Ann. §§ 24.002, 24.005, 51.002 (Vernon Supp.
2007). According to Pyles, the Youngs committed fraud on the district court by alleging all proper
notices had been given. The Youngs respond that the doctrine of res judicata prohibits Pyles from
raising the sufficiency of the foreclosure notices in the first suit. (7)

 Res judicata, also known as claim preclusion, prevents the relitigation of a finally-adjudicated
claim and related matters that should have been litigated in a prior suit. Barr v. Resolution Trust
Corp., 837 S.W.2d 627, 628 (Tex. 1992). Texas follows the transactional approach to res judicata. 
Id. at 630. This approach mandates that a defendant bring as a counterclaim any claim arising out
of the transaction or occurrence that is the subject matter of the opposing party's suit. State & County
Mut. Fire Ins. Co. v. Miller, 52 S.W.3d 693, 696 (Tex. 2001); Barr, 837 S.W.2d at 630. It requires
proof of three elements: (1) a prior final judgment on the merits by a court of competent jurisdiction,
(2) identity of parties or those in privity with them, and (3) a second action based on the same claims
as were raised or could have been raised in the first action. Amstadt v. United States Brass Corp.,
919 S.W.2d 644, 652 (Tex. 1996); Cherokee Water Co. v. Freeman, 145 S.W.3d 809, 813 (Tex.
App.--Texarkana 2004, pet. denied).

 Res judicata will bar the assertion in a second suit of a claim that should have been litigated
as a defense or compulsory counterclaim in a prior suit. See Ingersoll-Rand Co. v. Valero Energy
Corp., 997 S.W.2d 203, 208-10 (Tex. 1999); Jack H. Brown & Co. v. Nw. Sign Co., 718 S.W.2d
397, 399-400 (Tex. App.--Dallas 1986, writ ref'd n.r.e.) (applies even if original suit ended in
default judgment). The Youngs provided proof of all the elements of res judicata. The first suit was
a final judgment involving the same transaction, and the notice issues could have been raised in the
first action. Both Pyles and the Youngs were parties in the first suit. Res judicata precludes Pyles
from claiming in this suit that the notice in the first suit was insufficient.

 Pyles argues the Youngs have confused the doctrines of collateral estoppel, or issue
preclusion, with res judicata, or claim preclusion. According to Pyles, the "correct doctrine to apply
here is collateral estoppel." Issue preclusion, or collateral estoppel, prevents the re-litigation of
particular issues already resolved in a prior suit. Lone Star Partners v. Nationsbank Corp., 893
S.W.2d 593, 597 (Tex. App.--Texarkana 1994, writ denied). However, collateral estoppel and res
judicata are not mutually exclusive doctrines. "Collateral estoppel is narrower than res judicata. It
is frequently characterized as issue preclusion because it bars relitigation of any ultimate issue of fact
actually litigated and essential to the judgment in a prior suit . . . ." Bonniwell v. Beech Aircraft
Corp., 663 S.W.2d 816, 818 (Tex. 1984). The inquiry for collateral estoppel, unlike res judicata, is
focused on the point or question actually litigated and determined in the original action, not what
might have been litigated and determined. See Getty Oil Co. v. Ins. Co. of N. Am., 845 S.W.2d 794,
800 (Tex. 1992). The fact that issue preclusion may not bar litigation of an issue does not prevent
the application of claim preclusion. Because the elements of claim preclusion have been met, Pyles
is prohibited from challenging the adequacy of the notice in the first suit.

 Pyles argues that the fraud on the court renders the first suit void. A void judgment is not
susceptible to ratification or confirmation, and its nullity cannot be waived. Easterline v. Bean, 121
Tex. 327, 49 S.W.2d 427, 429 (1932); In re Redding, No. 12-07-00098-CV, 2007 Tex. App. LEXIS
3329 (Tex. App.--Tyler Apr. 30, 2007, orig. proceeding [mand. dismissed]); In re Guardianship of
Erickson, 208 S.W.3d 737, 740 (Tex. App.--Texarkana 2006, no pet.). However, the fact that a
final judgment may have been wrong does not affect the application of res judicata. Segrest v.
Segrest, 649 S.W.2d 610, 612 (Tex. 1983). A judgment is void only when the court rendering
judgment "had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no
jurisdiction to enter the particular judgment, or no capacity to act." Browning v. Prostok, 165
S.W.3d 336, 346 (Tex. 2005) (citing Austin Indep. Sch. Dist. v. Sierra Club, 495 S.W.2d 878, 881
(Tex. 1973)); see Geldard v. Watson, 214 S.W.3d 202, 209 (Tex. App.--Texarkana 2007, no pet.)
(judgment void because justice court lacked jurisdiction to adjudicate the merits of title). Because
the district court had jurisdiction in the first suit, any other error merely renders the judgment
voidable rather than void. Armentor v. Kern, 178 S.W.3d 147, 149 (Tex. App.--Houston [1st Dist.]
2005, no pet.). Even an erroneous judgment does not render the final judgment void. There are
procedures by which Pyles may have been able to successfully challenge the foreclosure notices. (8) 
Pyles, though, is now barred from challenging the sufficiency of the foreclosure notices by the
doctrine of res judicata.

We Decline to Assess Sanctions Against Either Party

 Both sides have requested that this Court award sanctions for their opponent's actions. Pyles
requests that we assess sanctions under various rules, including Tex. R. App. P. 43.6, which allows
this Court to make "any other appropriate order that the law and the nature of the case require." See
Tex. R. App. P. 43.6. Pyles claims theYoungs and their counsel have misstated and misquoted the
law and the facts. In addition, Pyles requests we assess sanctions against the Youngs and their
counsel for committing fraud in the first suit. The Youngs claim Pyles has brought a frivolous
appeal and request sanctions against Pyles and his counsel. Under Rule 45, we may, at our
discretion, award "just damages" to a prevailing party in an appeal if we determine the appeal is
frivolous after considering the record, briefs, or other papers filed. See Tex. R. App. P. 45; Solares
v. Solares, 232 S.W.3d 873, 883 (Tex. App.--Dallas 2007, no pet.). "An appeal is frivolous if when
it is brought there were no reasonable grounds to believe the judgment would be reversed or when
it is pursued in bad faith." Id. We have no doubt both sides could have disposed of this dispute
more efficiently. However, after reviewing the record and the briefs, we decline to find Pyles' appeal
frivolous and decline to sanction the Youngs under Rule 45. We overrule both requests for
sanctions.

 We affirm the judgment of the trial court.




 Jack Carter

 Justice


Date Submitted: November 21, 2007

Date Decided: December 21, 2007


1. The contract contains a handwritten notation correcting the address from 8822 P.R. 2284.
2. The copy of the contract filed by the Youngs contains a handwritten correction that the
monthly installments shall continue until April 1, 2005. The copy of the contract filed by Pyles does
not contain this correction and specifies the monthly installments shall continue until April 1, 2002. 
3. Young claims a letter notifying Pyles of default was sent April 25, 2003. The record does
not contain a copy of this letter.
4. We note the justice court rendered judgment to the wrong address: 8822 PR 2284.
5. The judgment also provides that Pyles' "Original Counterpetition" shall be severed from this
cause. No complaint has been made to the severance.
6. We note that we do not have a complete record on appeal. The trial in the county court at
law occurred on or about December 20, 2006. The reporter's record filed with this Court does not
contain any record of the proceedings on December 20, 2006. The Texas Rules of Appellate
Procedure now provide for the use of a partial record. See Tex. R. App. P. 34.6(c). If Rule 34.6(c)
is properly invoked, we must presume that the record is the entire record for purposes of reviewing
stated issues, even if the issue complains of the insufficiency of evidence to support a specific
finding. See id.; Furr's Supermarkets, Inc. v. Bethune, 53 S.W.3d 375, 380 (Tex. 2001). Pyles,
though, failed to successfully traverse the rule. Under Rule 34.6(c)(1), "[i]f the appellant requests
a partial reporter's record, the appellant must include in the request a statement of the points or issues
to be presented on appeal and will then be limited to those points or issues." See Tex. R. App. P.
34.6(c)(1). The record in this case does not contain a statement of points. 

 If the record is incomplete and the appellant has not complied with Rule 34.6(c), the appellate
court must presume that the omitted portions support the judgment or order from which the appeal
is taken. In re Estate of Arrendell, 213 S.W.3d 496, 503 (Tex. App.--Texarkana 2006, no pet.);
CMM Grain Co. v. Ozgunduz, 991 S.W.2d 437, 439-40 (Tex. App.--Fort Worth 1999, no pet.); see
Christiansen v. Prezelski, 782 S.W.2d 842, 843 (Tex. 1990). Therefore, we must presume the
omitted portions of the record support the judgment. 
7. The Youngs also claim the notices were "actually delivered to Appellant on numerous
occasions, both personally and through his counsel of record." The Youngs, though, fail to direct
us to where this statement is supported by the record.
8. Pyles had the opportunity to challenge the foreclosure notices at the first trial in district
court, but failed to appear for trial. Pyles did not appeal the post-answer default judgment. We note
Pyles cites several provisions from Texas Jurisprudence providing a judgment can be vacated based
on fraud. See 48 Tex. Jur. 3d Judgments §§ 257, 328 (2007). Section 257 specifically provides
such a challenge "is in essence a bill of review and is governed by the law applicable to such
proceedings." 48 Tex. Jur. 3d Judgments § 257. A bill of review requires the proponent to plead
and prove 1) a meritorious defense, 2) that he or she was prevented from making due to the fraud,
accident, or wrongful act of his or her opponent, and 3) that the failure to appear was unmixed with
any fault or negligence of his or her own. 5 Roy W. McDonald & Elaine A. Carlson, Texas
Civil Practice § 29:10 (1999); Cortland Line Co. v. Israel, 874 S.W.2d 178, 183 (Tex.
App.--Houston [14th Dist.] 1994, writ denied). According to an attachment filed to appellee's brief,
Pyles has filed a bill of review action in a separate proceeding.



 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoNoSpacingCxSpLast, li.MsoNoSpacingCxSpLast, div.MsoNoSpacingCxSpLast
 {mso-style-name:"No Spacing\,QuotationCxSpLast";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
.MsoPapDefault
 {mso-style-type:export-only;
 margin-bottom:10.0pt;
 line-height:115%;}
 /* Page Definitions */
 @page
 {mso-page-border-surround-header:no;
 mso-page-border-surround-footer:no;
 mso-footnote-separator:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") fs;
 mso-footnote-continuation-separator:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") fcs;
 mso-endnote-separator:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") es;
 mso-endnote-continuation-separator:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:1.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") f1;
 mso-first-header:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
@page Section2
 {size:8.5in 11.0in;
 margin:2.0in 1.0in 1.0in 1.0in;
 mso-header-margin:2.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") f2;
 mso-first-header:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-09-172-CR%20Holz%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.Section2
 {page:Section2;}
-->











 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00172-CR

                                                ______________________________

 

 

                                         BARBARA HOLZ,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                                  On Appeal from the County Court

                                                            Marion County, Texas

                                                            Trial
Court No. 12,944

 

                                                                         
                         

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            There is no
question that the dog named Misty, also identified as Lone Star 42, was a
pitiful sight when the Rescue and Investigations Division of the Society for
the Prevention of Cruelty to Animals (SPCA) of Texas removed her from Barbara
Holzs Marion County property.  Beyond
that indisputable fact, however, the SPCAs view differed from Holzs
perspective.

            Holz claimed
that Misty was about fifteen years old at the time; the SPCA estimated her age
at around eight years.  Holz claimed that
she had been nursing Misty toward health, with some success, and that Misty was
properly and carefully provided food and water. 
The contrary view was that Misty was not provided adequate food and
water.  Misty was one of the more extreme
examples among a large number of dogs taken from Holzs property at the same
time, in varying degrees of distress and poor condition.

            Holz was
convicted of the misdemeanor offense of cruelty to animals.[1]  After reviewing the briefs before us, the record
of the trial below, and the applicable law, we affirm the judgment of the trial
court because (1) veterinary reports admitted into evidence at trial were not
testimonial, (2) Holz did not preserve her complaint regarding admission of
testimony about dead dogs found nearby, and (3) the evidence was legally and
factually sufficient.

 

(1)        Veterinary Reports Admitted into
Evidence at Trial Were Not Testimonial

 

            Holzs
first two points of error claim violations of her Sixth Amendment right to
confront witnesses against her.  Holz
claims confrontation violations in evidence of two forms generated by the SPCA,
one by its veterinary technician (States Exhibit 4, the subject of Holzs
first point of error), and another by its chief veterinarian (States Exhibit
5, addressed in point of error 2).  See Crawford
v. Washington, 541 U.S. 36, 68 (2004). 
In Crawford, the United States
Supreme Court held that out-of-court testimonial evidence violates the
Confrontation Clause unless the declarant is unavailable to testify and the
defendant had a prior opportunity to cross-examine him or her.  Id.  

            The
State argues, as it did at trial, that the documents were admissible as
business records.  See Tex. R. Evid. 803(6).  That the reports are business records is not
contested.

            Even
if a statement is allowed by a rule of evidence, it may still be testimonial
and implicate the Confrontation Clause. 
Last year, the United States Supreme Court discussed, in this context,
hearsay exceptions such as that for business records, noting, [b]usiness and
public records are generally admissible absent confrontation not because they
qualify under an exception to the hearsay rules, but becausehaving been
created for the administration of an entitys affairs and not for the purpose
of establishing or proving some fact at trialthey are not testimonial.[2]  Melendez-Diaz,
129 S.Ct. at 253940.  For the Melendez-Diaz Court, the question of the
document qualifying as a business record was less important than the fact that
it was prepared specifically for use at . . . trial.  Id.
at 2540.  Evidence can qualify as a
business record exception to the hearsay rule and still be testimonial in
nature.

            We
must determine whether the challenged exhibits are testimonial, and we do that
as a question of law.  Wall v. State, 184 S.W.3d 730, 742 (Tex.
Crim. App. 2006).  

            Although
the United States Supreme Court has not set out a detailed definition of what
constitutes testimonial statements, it has described such statements as those
made under circumstances which would lead an objective witness reasonably to
believe that the statement would be available for use at a later trial.  Crawford,
541 U.S. at 5152.  In a test that can be
confidently applied in this case, statements are testimonial only when the
primary purpose of the interrogation is to establish or prove past events
potentially relevant to later criminal prosecution. Davis, 547 U.S. at 822; De La
Paz v. State, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).  If that purpose is medical treatment, for
example, the statement would not be testimonial.  Melendez-Diaz,
129 S.Ct. at 2533 n.2 (medical reports created for treatment purposes . . .
would not be testimonial).

            The
SPCA came to Holzs house, corralled, cataloged, and seized the animals; and it
was employees of the SPCA, the veterinary technician and the SPCAs chief
veterinarian who authored the reports which form the basis of Holzs Crawford complaints.[3]  While it is possible that the authors of
those reports could have reasonably believed that these reports would be
available at a later trial, such a conclusion is not clear, and there is no
evidence the documents at issue in Holzs trial were prepared specifically for
use at her trial.  Cf. Melendez-Diaz, 129
S.Ct. at 2540 (statements at issue prepared specifically for use at petitioners
trial).  There is nothing in the record
to suggest the documents were prepared in anticipation of or preparation for
trial.

            Here,
SPCA investigator Chris West testified that the Rescue Evaluation FormStates
Exhibit 4, compiled by a veterinary technicianwas a form that was done on any
animal with the exception of equine and cattle.  States Exhibit 5, filled out by the SPCA
chief veterinarian, was described as a veterinarian request that the
investigators and evaluators would fill out while they are evaluating animals
if we feel that they need to be seen by a vet within the first 24-hours of our
care.  West went on to describe the
conditions in which the animals lived outside the home, and he concluded the
animals needed to be removed from the property. 
From the context of Wests testimony and pictures in the record, it
appears similar Rescue Evaluation Forms were completed on all dogs at the
scene.  Exhibit 5, completed and signed
by a veterinarian, has two distinct sets of handwriting; one set says, RescuePlease
check body condition, hair loss, eye discharge 
*Dog was extremely hungry*. The second style of handwriting, presumably
by the veterinarian, says, THIN & EMACIATED [;] NO [SYMBOL UNCLEAR] OR
DIARRHEA NOTED [;] EATING VORACIOUSLY [;] DIFFUSE ALOPECIA.  Based on the context of the testimony from
West and the exhibits, we conclude these documents were compiled for diagnostic
or medical treatment purposes, and therefore are not testimonial.  See
Melendez-Diaz, 129 S.Ct. at 2533 n.2; Berkley
v. State, 298 S.W.3d 712, 715 (Tex. App.San Antonio 2009, pet. refd)
(where there was unchallenged evidence sexual assault nursing examination
report was completed for purpose of rendering medical treatment, report not
testimonial; citing Crawford and Melendez-Diaz).[4]  As States Exhibits 4 and 5 were not testimonial,
the trial court did not err in admitting them to evidence.  Holzs first two points of error are
overruled.

(2)        Holz Did Not Preserve Her Complaint Regarding
Admission of Testimony About Dead      Dogs
Found Nearby

 

            Holz
also claims error in the trial courts admission of testimony that Don Adams,
Holzs neighbor, found dog carcasses on his property and that drag marks led
from the container in which the animals were found to Holzs property.  Adams also testified that he found dead dogs
on the Corp property, which apparently was United States Corp of Engineers
property adjacent to Adams, and possibly to Holzs as well.  The inference to be drawn by the jury seems
to have been that Holz took the bodies of dead dogs to these properties.

            Adams
testimony and Holzs objection occurred as follows:

Q.        [By
the State]  Did you find dead dogs on your
property?

 

A.        [By
Adams]                I did.

 

Q.        
And did you see dead dogs on the Corp property, by the way?

 

            [Defense
counsel]:      This testimony, Your Honor,
for the record, we would object to any testimony about dogs found that had
nothing to do with this case.

 

The State claims this objection was
inadequate to preserve appellate review. 
From the context of the questioning and the objection lodged, it appears
that, while Holz may have been objecting to any reference to any dead dogs
found in the vicinity of her property (and this is how she couches her
appellate point of error), at most she timely objected to the question about
finding dead dogs on the Corp property, and failed to timely object to Adams
answer that he found dead dogs on his property.[5]  Therefore, we find Holz only preserved error
regarding the question and answer about animals found on the Corp
property.  The matter becomes moot,
though, because that objection does not comport with the appellate point Holz
now raises.  

            We read Holzs objection as one to
the relevance of the evidence.  In
contrast, in her appellate brief, Holz complains that admission of evidence
that dead dogs were found in the vicinity of Holzs property was erroneously
admitted.  Holz argues that, even if the
evidence fits into an exception to the extraneous offense rule such as res
gestae, identify [sic], scienter, motive or to refute a defensive theory so as
to become admissible, its relevance must not be outweighed by the prejudicial
effect.  Holzs appellate point does not
comport with her trial objection and is not preserved for our review.  Tex.
R. App. P. 33.1; Resendiz v. State,
112 S.W.3d 541, 547 (Tex. Crim. App. 2003).[6]

(3)        The
Evidence Was Legally and Factually Sufficient

 

            Holz also complains the evidence is
legally and factually insufficient to support the jurys verdict.  We disagree.

            In
reviewing the legal sufficiency of the evidence, we view all of the evidence in
the light most favorable to the prosecution and determine whether, based on
that evidence and reasonable inferences therefrom, any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt.
 Laster
v. State, 275 S.W.3d 512 (Tex. Crim. App. 2009); Roberts v. State, 273 S.W.3d 322 (Tex. Crim. App. 2008).

            In
a factual sufficiency review, we review all the evidence, but do so in a
neutral light instead of the light most favorable to the verdict.  We determine whether the evidence supporting
the verdict is either too weak to support the fact-finders verdict, or,
considering conflicting evidence, is so outweighed by the great weight and
preponderance of the evidence that the jurys verdict is clearly wrong and manifestly
unjust.  Laster, 275 S.W.3d 512; Lancon
v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

            In
this analysis, we use a hypothetically correct jury charge to evaluate both the
legal and factual sufficiency of evidence.  Grotti
v. State, 273 S.W.3d 273 (Tex. Crim. App. 2008).  Such a charge accurately sets out the law, is
authorized by the indictment (in this case, the information), does not
unnecessarily increase the States burden of proof or unnecessarily restrict
the States theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Villarreal v. State, 286
S.W.3d 321(Tex. Crim. App. 2009); Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  To convict Holz under this statute and the
information filed by the State, the State had to prove that Holz (1)
intentionally or knowingly; (2) failed unreasonably to provide necessary food,
water, care, or shelter; (3) to an animal in Holzs custody.  Tex.
Penal Code Ann. § 42.092(b)(3) (Vernon Supp. 2009). 

 

            Holz lived
near Lake O the Pines in Marion County. 
She had about thirty to forty or more dogs in and on the grounds of her
house in Marion County in July 2008.[7]  The dogs were found in wretched conditionmany
with matted fur, eye discharges which indicated infections, and living in unclean
pens.  Inside the house, where many dogs
were housed, was wall-to-wall compacted excrement, which produced a dangerous
level of ammonia within the residence.  

            Don
Adams lived across the street, about 300 yards from Holzs residence.  Adams was concerned about the large number of
dogs on Holzs property.  On one occasion,
Adams found dead dogs on his property. 
Adams also found a large plastic container on the property adjacent to
his, which at trial Adams and the State referred to as Corp property.  Track or drag marks led from the container to
Holzs property.  Adams described seeing
evidence of several puppies dead after laying in the road and other dogs dying
off.  He described an unpleasant smell
from Holzs property when the wind blew toward Adams property.  Adams voiced these concerns to Marion County
law enforcement agencies, who put him in touch with Caroline Wedding, president
of the Humane Society of Marion County.

            Wedding
made contact with Holz and ultimately visited Holzs property.  As soon as Wedding emerged from her car at the
Holz property, Weddings leg was covered with fleas.  She gave Holz flea shampoo, loaned her crates
for carrying the dogs, and arranged for payment for a local veterinarian to
administer vaccines to the several puppies Holz had.  Wedding and Holz discussed that puppies were more
adoptable if they had been given vaccinations. 
On her first visit, Wedding did not go in Holzs house, but said there
was a stench or smell coming from the house. 


            On
July 10, 2008, when Wedding came to the house with the SPCA and the animals
were seized, Wedding described the inside of the house, where Misty was found.  Wedding saw feces up several feet on the
walls and she said everything in the house was covered in feces and urine.  West described the feces as compacted like
concrete.  Wedding said she was [a]bsolutely
sure there was insufficient food for the dogs on Holzs property.  When Misty, the subject of the instant
information, was released from the house, the dog stopped at a food bowl and
ate voracious[ly]: there was no stopping the dog from eating the food.  The dog just had no hair said Wedding,
which she said indicated malnutrition.  Wedding
said the dogs in the house did not have access to adequate water.  While there was evidence of some water in
bowls inside and outside the house, Wedding testified that there was only
enough for subsistence and that feeding a dog marginally or at all [sic] and
giving it water is not proper care of an animal.  

            Misty
is portrayed in a picture placed into evidence. 
She was very thin, with ribs clearly distinguishable under her
skin.  She was almost completely bereft
of hair.  

            West
testified he was notified by Wedding about the dogs and the conditions at Holzs
property.  West first visited the
property without Wedding, July 9, and spoke to Holz, who would not allow West
to examine the interior of her home or the dogs there without a warrant.  In his tour of the exterior of the property,
though, West immediately had concerns about lack of water and shelter for the
dogs he saw, as well as evidence of malnutrition.  When West asked Holz about the veterinary
care the dogs received, Holz told him she believed in the holistic approach. .
. . and only the really worst ones needed to be seen by a vet.  Based on his observations, West decided the
dogs needed to be removed from the property, and he secured a warrant for their
seizure.  On July 10, he oversaw the
seizure, where SPCA personnel identified, catalogued, and secured something in
excess of thirty dogs.   When West tried to enter the house, he was met
with an extremely foul odor coming from inside.  Using an ammonia meter, he detected a
dangerous level of ammonia.  He had to
use a respirator to get into the house, and in less than a minute the ammonia
meter hit its maximum reading of ninety-nine parts per million.  According to West, any reading higher than fifteen
parts per million is unsafe for long-term exposure; a reading of more than fifty,
said West, would usually preclude entry without protection.  West never specifically said there was no
circulation or air conditioning in the house, but did say the temperature
outside was in the nineties.  Holz would
later testify the house had adequate ventilation and air conditioning.  

            The
animals were put in individual crates or containers and taken to the SPCA
facility in McKinney, Texas.  During the
seizure process, photographs were taken to detail the condition of the
property; the photographs were admitted into evidence.  West described a large amount of feces and
refuse in the dogs pens and said he did not see any water in the various water
bowls in the outside area.  Nor did he
recall seeing any food in any of the food bowls.

            Misty
was described by West as emaciated.  West
said, On a one to five scale, one being a perfectly healthy dog, five being grossly
emaciated, the dog is a five.  Its
emaciated.   

            The
State presented a veterinarian, Dr. Carol Hedges.  She had reviewed the Rescue Evaluation Form
completed by an SPCA veterinary technician and a document completed by the SPCAs
veterinarian.[8]  Hedges said that irrespective of the report
from the SPCA veterinarian, pictures she had seen of the dogs at Holzs
property made Hedges take note of the animals body condition, hair loss,
dermatitis, and long nails.  She said
these conditions were objectively noticeable, as opposed to subjective
descriptions she would have gleaned from others reports.  These conditions indicated the dogs were not
getting basic care.  Based on the
pictures she had seen of the various dogs, and Misty in particular, as well as
the SPCA veterinarians report, she opined that Misty was not being fed
adequately.  Hedges pointed out that,
where multiple dogs are present, a pecking order is established where, even
if food is present, some animals may not get to eat.  She expressed the specific opinion that Misty
did not appear to be in good health.  As
for the house in which Misty was found, Hedges said the conditions in the house
would perpetuate repeated infections, parasites, and other diseases.  

            Holz
took the stand in her defense.  She
testified that Misty was actually about fifteen years old when seized, as
opposed to the age of about eight as estimated by the SPCA forms.  Holz attributed Mistys skin problems to
hormones, a thyroid condition, and demodex mange, which Misty had inherited
from her mother.  Holz said she fed Misty
holistic, natural foods (including ground turkey) frequently, every two to
three hours.  She said Misty had been
very sick, but, in the two to three months before the seizure, Holz had nursed
her back to the condition in which the SPCA found her in July 2008.  Holz acknowledged that Misty had not been
seen by a veterinarian since 2002.  Holz
also pointed out several food and water bowls throughout the inside and outside
areas where the dogs lived and said the house was well ventilated with central
air, window-unit air conditioners, and fans, which kept the house air
conditioner cool.  Holz acknowledged
there was a problem with too many dogs, which overwhelmed her, but she blamed
the problem on people routinely dumping puppies and dogs near her property and
she said she had consistently tried to get help from Marion County authorities.  

            (a)        Legal
Sufficiency

            The
evidence included a picture of Misty, missing most of her hair and with ribs
showing prominently through her skin; descriptions of Misty eating voraciously
when food was placed in front of her; and the SPCA investigator describing Misty
as emaciated.  The home in which Misty was
kept had a dramatically unsafe ammonia level. 
There were upwards of thirty or more animals living inside the house,
which was described as filled with excrement. 
The evaluation forms completed on the SPCAs taking possession of Misty described
her as emaciated and noted various parasites as well as discharges from her
eyes and nose and the apparent presence of mange.  Looking at the verdict in the light most
favorable to the prosecution, a rational jury could have found that Holz
unreasonably knowingly failed to provide, at a minimum, adequate food, care, or
shelter for the dog the subject of this suit. 
The evidence was legally sufficient.

            (b)        Factual
Sufficiency

            Here,
we also look at the evidence that opposed the judgment of the trial court.  Holz told the jury she fed Misty every two to
three hours and, at the time of the seizure, had been nursing Misty back to
health for months.  Holz said the floor of
the house was covered in chocolate- colored carpet, not compacted feces.  As regards the ammonia-concentrated air and
stench described by States witnesses, Holz said that she had ample ventilation
in the house with air conditioners and fans and that she did not notice any
smell, though she did admit it could have been because she was around it all
the time.  Contrary to the heart of the
States allegations that Holz did not provide sufficient water and food, the
testimony from States witnesses was that they could not be sure no food or
water was set out.  In some of the
pictures admitted into evidence, water and food are visible in bowls on the
ground.  However, West did testify that
the SPCA personnel set out food when they arrived.  We defer to the jury to resolve conflicts in
testimony and evaluate witness credibility, and will not substitute our opinion
unless the jurys finding is clearly wrong or unjust.  Jones
v. State, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996).

            Considering
all the evidence in a neutral light, we find that the evidence was neither so
weak nor so outweighed by the great weight of any contrary evidence as to make
the verdict seem clearly wrong and manifestly unjust.  The evidence was factually sufficient.

 

 

 

            We
affirm the trial courts judgment.

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          February
10, 2010       

Date Decided:             March
23, 2010

 

Do Not Publish

 

 

 











[1]We
have been presented with a record for only the case in which Holz was
convicted.  Holz asserts she was tried
for two charges of misdemeanor cruelty to animals, where each case alleged an
offense against a specific animal.  Holz
says she was acquitted on one charge and convicted of the other.  The State does not dispute this
representation of the proceedings, and the statements at opening and closing
arguments, as well as testimony throughout the trial, support this reading of
the procedural history.  The parties also
seem to agree that the one charge for which Holz was convicted involved an allegation
of failing to provide food, water, or shelter to an animal referred to in the
SPCA investigation and then at trial as Lone Star 42, a dog Holz called
Misty.





[2]Melendez-Diaz
was tried for distributing and trafficking in cocaine.  Melendez-Diaz v. Massachusetts,
129 S.Ct. 2527, 2530 (2009).  To prove
the substance at issue was cocaine, the State presented certificates of
analysis, which were affidavits from analysts at the state laboratory stating, The
substance was found to contain:  Cocaine. 
Id. at 2531.  The defendant objected, asserting that the
Confrontation Clause required the analysts to testify in person.  Id.  The Court held that the analysts affidavits
were testimonial statements, and the analysts were witnesses for purposes of
the Sixth Amendment and that the defendant had a right to confront the
analysts at trial.  Id. at 2532.  The United
States Supreme Court looked to the substance of the certificates to determine
if they were made under circumstances which would lead an objective witness
reasonably to believe that the statement would be available for use at a later
trial and to the use of the affidavits to determine if they were functionally
identical to live, in-court testimony, doing precisely what a witness does on
direct examination. Id. (quoting Davis v. Washington, 547 U.S. 813, 830
(2006); Crawford, 541 U.S. at 52).





[3]The
only law enforcement agent to testify at trial was a Marion County sheriffs
office investigator who testified that (1) he was present when the warrant to
seize the dogs was executed and, (2) he arrested Holz. 





[4]Cf. Long
v. State, No. 11-07-00319-CR, 2009 Tex. App. LEXIS 6577 (Tex. App.Eastland
Aug. 20, 2009, pet. dismd) (mem. op., not designated for publication) (Trial
court admitted, under hearsay exception for statements for purposes of medical
diagnosis, toxicology report completed during autopsy of murder victim.  Toxicology report was negative for use of
alcohol or drugs.  Court found toxicology
report testimonial, and therefore trial court erred in allowing its admission;
error was found harmless beyond reasonable doubt.). 





[5]To
preserve error regarding the improper admission of evidence, the appellant must
make a timely and specific objection to the complained-of evidence at trial.  Tex. R.
App. P. 33.1(a); Ramirez v. State,
74 S.W.3d 152, 154 (Tex. App.Amarillo 2002, pet. refd).  Failure to do so waives any error in the
admission of the evidence. Boyington v.
State, 787 S.W.2d 469, 47071 (Tex. App.Houston [14th Dist.] 1990, pet.
refd).  To be timely, a party must
object either (1) before the evidence is admitted, if possible, or (2) if not
possible to object before the evidence is admitted, as soon as the
objectionable nature of the evidence becomes apparent.  Ethington
v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991).  An appellants objection is untimely, and
error is waived, if he or she fails to object until after an objectionable
question has been asked and answered and he or she can show no legitimate
reason to justify the delay.  Dinkins v. State, 894 S.W.2d 330, 355
(Tex. Crim. App. 1995).





[6]The
balance of her argument is as follows:  

 

Appellant urges that the evidence
of dead dogs was not admissible under any exception to the extraneous offense
rule and that the prejudicial effect of admitted evidence of dead dogs in a
prosecution for animal cruelty is so prejudicial that the case must be reversed
and retried without this evidence.

 

We infer that in this single sentence Holz is
attempting to argue violations of evidentiary Rules 403 and 404(b).  Tex.
R. Evid. 403, 404(b).  Not only
are discrete, specific objections required to raise these legal points, but
individual, specific legal arguments must be presented to address each asserted
rule violation on appeal.  See Montgomery
v. State, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on rehg); see also Tex. R. App. P. 38.1(i).

 





[7]The
numbers of dogs, including on Holzs property outside the house and inside the
house, varied.  The State asked Holz how
many of the eighty dogs found were hers. 
Holz said there were not eighty dogs present, but that she had
twenty-four.  SPCA investigator West
testified there were thirty to thirty-five dogs inside the house, but never
estimated the number of dogs outside Holzs home.  Wedding, president of the Humane Society of
Marion County, testified there were thirty to thirty-seven dogs inside the
house.  Several photographs admitted into
evidence showed, perhaps, tens of dogs in the fenced areas immediately outside
the home.





[8]These
documents, States Exhibits 4 and 5 respectively, were admitted into evidence
during the testimony of West, and form the basis of Holzs first two points of
error.